PER CURIAM.
| tThis disciplinary matter arises from formal charges- filed by the Office of Disciplinary Counsel (“ODC”) against respondent, Christine M. Mire, an attorney licensed to practice law in Louisiana.
UNDERLYING FACTS
Count I — The Keaty Matter
By way of background, Judge Phyllis Keaty presided over family law matters in the 15th Judicial District Court during the time in question.[1] Respondent regularly practiced family law in the 15th JDC at this time.[2] • < . «■
In one such case, McNabb v. McNabb, respondent represented Stanford McNabb. Against respondent’s advice, Mr. McNabb filed a pro se motion to recuse Judge Keaty on grounds of bias and incompetence. Gn September Í5, 2009, Judge Keaty recused herself in the McNabb matter, but did not assign reasons' for her recusal.. .■•••.
Meanwhile, respondent had several other family law matters pending before Judge Keaty, including Hunter v. Hunter. In that matter, respondent represented Kenneth Hunter in a child custody,- visitation, and support proceeding involving his | gformer wife, Cheri Coussan Hunter. In a hearing on July 20, 2009, Judge Keaty made a disclosure on. the record regarding the extent of the relationship between herself and her family and Ms. Coussan and her family. Respondent and opposing counsel both stated that there were no objections to Judge Keaty1s disclosure, and the hearing proceeded.
Mr. Hunter subsequently became concerned that Judge Keaty was biased in favor of his former wife. In addition, respondent discovered additional connections between Judge Keaty’s family and the Coussan family which she felt made Judge Keaty’s earlier disclosure inadequate. Therefore, Mr. Hunter instructed respondent to file a motion to recuse Judge Keaty. In a chambers conference on September 17, 2009, respondent, at the request of her client, presented Judge Keaty with a motion to recuse. The motion alleged three grounds for recusal: (1) Judge Keaty failed to fully,disclose the extent of the *658 relationship between herself and her family and Ms. Coussan and her family; (2) Judge Keaty indicated that she would not follow the law regardless of the evidence presented at trial [relating to the use of Worksheet “B” in shared custody arrangements]; and (3) the manner in which the case had been handled, the rulings made, and the deference given to Ms. Coussan over Mr. Hunter all manifested a bias or prejudice toward Ms. Coussan.
During the chambers conference, Judge Keaty was insistent that the parties and Mr. Hunter’s prior attorney were fully aware of the circumstances of her relationship with the Coussan family, as she stated that she made those disclosures in earlier proceedings. Judge Keaty took the motion to recuse under advisement and stayed the proceedings.
The following day, September 18, 2009, respondent e-mailed Judge Keaty’s court reporter and requested that she prepare the transcript of three hearings in the Hunter matter, including the July 20, 2009 hearing. When respondent received the | ^transcript of the hearing, she claimed it contained a statement which had not been made at the hearing.[3] Respondent ultimately obtained the court reporter’s tapes and had them analyzed, but the court never made any factual findings regarding any alleged alterations to the hearing transcript.[4]
Meanwhile, in the McNabb case, respondent had appealed a ruling made by Judge Keaty prior to her recusal. On November 13, 2009, Chief Judge Ulysses Gene Thibo-deaux of the Court of Appeal, Third Circuit signed an order directing the clerk of the 15th JDC to prepare a proffer of Mr. McNabb’s motion to recuse filed August 18, 2009 and Judge Keaty’s order of recu-sal signed September 14, 2009. The order concluded that “[t]he panel on the merits shall determine whether the proffer is properly before the Court on appeal.” The court of appeal panel consisted of Judges Thibodeaux, Peters, and Painter.
Respondent and Mr. McNabb estimated that approximately 90% of the March 31, 2010 oral argument was spent discussing Judge Keaty’s post-judgment recusal, and whether this action necessitated a de novo review by the court of appeal of all of her rulings, as respondent argued. However, the court of appeal affirmed Judge Keaty’s ruling on April 21, 2010, finding the standard of review was manifest error because “the motion to recuse was not timely made, and ... has no • bearing on this appeal.” Moreover, in a concurrence, Chief Judge Thibodeaux stated:
While the recusal issue is mentioned in this appeal, the record is bereft of any evidence of its relationship to the Uspecific issues in this dispute. We are not aware of the contents of the motion to recuse nor does the record contain the Order of Recusal. I have my concerns, but the issue simply is not properly before us. [Emphasis added; citations omitted.]
*659 Respondent filed an application for rehearing, pointing out that the motion to recuse and the order of recusal were both in the record because the court of appeal had ordered the record supplemented with them. The court of appeal denied rehearing on May 26, 2010.
Respondent and Mr. McNabb thought that the court of appeal had simply been mistaken in its original statement that the motion to recuse and order of recusal were not in the record. However, once the court of appeal denied rehearing, respondent and Mr. McNabb became convinced that something had occurred which was “more difficult to explain.”
Respondent and Mr. McNabb drafted a writ application to this court which stated the following:
This case personifies the double edged sword of Justice. This case highlights the unfavorable consequences of the legal profession — incompetence and/or corruption of its members. Undeniably, the people who are elected to uphold the higher purpose of the law sometimes go their own way and believe that the people’s vested power is their own. The general public assumes that the vast majority of our legal community believes that no one does more harm to the legal system than one who has the name and rank of honor while he/she acts perversely. Unfortunately, this ease also exemplifies an additional and more horrifying issue — the tolerance and indifference of other judges, the Court of Appeals and other officers of the court who did nothing to help the financial and emotional pain of family law litigants and the most innocent of all victims— Stanford McNabb’s children. [Emphasis in original.]
⅝ # - *
The corruption and/or incompetence of attorneys and judges in this case is not only a systemic problem; it is an opportunity for reparation for Stanford McNabb and ^everyone who was victimized by a system- designed to protect their rights_
⅜ ⅜ ⅜
Stanford McNabb drives past- Judge Phyllis M. Keaty’s billboards and signs which advertise her desire to be the next member of the lower court which recently issued a decision contrary to the panels’ [sic] statements at-oral argument, the record, and the law. ... Although the lower court which affirmed the egregious actions of the trial court is the same court Judge Keaty is actively campaigning to sit upon, Stan did not presume wrongdoing. Rather, Stan presumed that the lower court’s opinion was a mistake since it was contrary to the panels’ [sic] statements at oral' argument However, when the rehearing was denied, a mistake became difficult to defend. This Honorable Court should consider this case from the vantage point of a litigant or outside third party. There are two plausible explanations: 1.) The lower court inadvertently issued an opinion written prior to oral argument. When Stan gently alerted them to the fact that the Motion and Order of Recusal was part of the record, the panel was confused and/or did not remember the oral argument of the matter and therefore again inadvertently denied rehearing; or 2.) The lower court wants to cover up the egregious actions of the trial court so it cannot be used in the current election. Either way this Court’s active intolerance of such incompetence and/or corruption is essential to restore integrity to the judicial system ....
Respondent attached a copy of the Hunter CD as an exhibit to Mr. McNabb’s *660 writ application, claiming that the inaccuracy of the transcripts of family court proceedings was not unique to Mr. McNabb’s case. Ultimately, this court did not consider the writ application in the McNabb case as it was not timely filed. McNabb v. McNabb, 10-1506 (La.10/1/10), 45 So.3d 1087. Despite being put on notice by the ODC of concerns with the language in the writ application, respondent circulated a copy of same by e-mail to her friends and colleagues in the Lafayette Bar.
The ODC alleged that respondent’s conduct violated the following provisions of the Rules of Professional Conduct: Rules 3.1 (meritorious claims and | (¡contentions), 3.2 (failure to make reasonable efforts to expedite litigation), 3.5(d) (a lawyer shall not engage in conduct intended to disrupt a tribunal), and 8.2(a) (a lawyer- shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge).[5] •
Count II — The Weinstein Matter
Attorney John' Weinstein represented Andrea Guillory and her then-husband, Doug Guillory, iñ a Chapter 13 bankruptcy matter filed in 2006. In October 2011, Mr. Weinstein filed a' disciplinary complaint against respondent based on her failure to promptly disgorge’$6,839.50 paid to her by Ms. Guillory, despite numerous court orders to do so.
By way of background, in September 2008, Ms. Guillory hired respondent to represent her in ancillary divorce matters, paying a total fee of $6,839.50. Respondent failed to obtain the bankruptcy judge’s approval to undertake the representation and collect the fee.
On November 11, 2009, Mr. Weinstein wrote to respondent attempting to recover the funds improperly paid by Ms. Guillory. When respondent failed to respond, Mr. Weinstein filed a motion with the bankruptcy court to turn over the funds. On January 12, 2011, following a hearing on the matter, Judge Robert Summerhays ordered respondent to disgorge the entire fee within twenty days. When respondent failed to do so, Mr. Weinstein filed a contempt proceeding on February 11, 2011. On March 22, 2011, respondent was held in contempt and Lagain ordered to disgorge the full fee, plus $100 per day for each day after April 5, 2011 that the fee was not fully paid, in response, respondent sought to appeal the two orders to the United States District Court. On August 3, 2011, United States District Court Judge Rebecca Doherty dismissed the appeal because the appeal of'the January 12, 2011 order was not timely filed and respondent failed to properly move for leave to appeal the March 22,2011 order.
On August 25, 2011, respondent sent Mr. Weinstein a check in the amount of $6,839.50 that contained a note on the memo line stating “full payment & settlement of pending claims.” Mr. Weinstein would not accept the check and demanded an additional $14,-100 because of the $100 per day sanction ordered by the bankruptcy judge in the March 22, 2011 order.
*661 . When respondent did not respond, Mr. Weinstein had the March 22,-2011 order made executory in the 15th JDC and filed a total of three judgment debtor rules. Respondent failed to fully cooperate in the first two judgment debtor rules and was assessed with court costs and ordered to pay $500 in attorney’s fees.
In the meantime, respondent moved to have the March 22, 2011 order of the bankruptcy court vacated, which motion was ultimately denied by the bankruptcy judge in an order dated May 10, 2012. At that time, .the bankruptcy judge also ordered respondent- to pay Mr. Weinstein $30,639.50 by May 14, 2012, with an additional $5,000 sanction imposed if respondent failed to do so. Respondent attempted to appeal this decision to the United States District Court, but the appeal was denied, with Judge Doherty noting that respondent “failed to properly and timely comply with the governing rules of appeal.” The judge also noted:
This Court, as well as the bankruptcy court’s having already spent an inordinate amount of time and judicial resources sifting through deficient and inappropriate filings as well as expending the time and judicial resources to create and review the full’record of her regrettable conduct before the- bankruptcy court, and noting both appeals involved matters of sanctions for her | «failure to comply with the bankruptcy court’s orders, this . Court concludes dismissal of the appeal for failure to timely file an appellate brief is justified. [Emphasis in original.]
Having not obeyed the May 10, 2012 order, respondent was sanctioned an additional $5,000. Respondent finally paid the entire $35,639.50 in October 2012, almost two years after the original order to disgorge the fee. •
■ The ODC alleged that respondent’s conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.15(d) (failure to timely remit funds to a client or third person), 3.1, 3.4(c) (knowing disobedience of an obligation under the rules of a tribunal), and 8.4(d) (engaging in conduct prejudicial to the administration of justice).
DISCIPLINARY PROCEEDINGS
In November 2013, the ODC filed formal charges against respondent. Respondent answered the formal charges, essentially denying any misconduct. The matter then proceeded to a formal hearing conducted by the hearing committee over the course of five days in August and September 2014.
At the hearing, one of the primary issues was whether respondent’s allegations of “incompetence and/or corruption” in the legai profession was supported by the alleged alteration of the hearing transcript in the Hunter matter. Respondent presented the testimony of Joel' Wax. Mr. Wax is a co-owner of the company which sells the For The Record (“FTR”), the digital recording system used -in the 15th JDC. He examined the CD of the July 20, 2009 hearing and testified the disc itself had not come directly from an FTR recorded machine. He could not say where it did come from, just that it was not recorded on the FTR system, because the files on the CD were not in FTR format (wav files). Instead, | flthere were different types of audio files, including Windows media files, which could not possibly have come from the FTR machine that way:
A. The CD that I looked at had been altered as far as the — I don’t know how they were altered or who altered them or whatever, but I do know that some of. the audio files that were on there, it was kind of like salt and peppered with dif *662 ferent types of audio files that were on there, not just the files that would come from FTR, from my recorder.
[[Image here]]
A. ... I saw a few wav files in there and then I’d see like a group of Windows Media Player files in there and then it would go back to wav files so it was kind of like scattered a little bit....
Q. They were interspersed with the wav files—
A. Yes, sir.
Q. — and DOS files?
A. Right. From what I can remember.
Q. And that it is just impossible to come off of the machine that way?
A. Very much so. Impossible.
[[Image here]]
Q. ... [W]hat you observed on the CD, did it suggest to you the possibility of alteration from the original content from the FTR machine?
A. It looked like it had been altered. Yes. But I’m not sure.
* ijs *
Q. I guess the possibility existed on the CD that you observed — the possibility existed that there was some splicing or maybe a piece of audio had been sandwiched in between two other pieces?
A. Yes, sir. From what I saw.
Q. All right. But you didn’t reach a conclusion one way or the other as to whether that happened, did you?
|10A. It looked like to me that it had been arranged differently. Yes.
* * *
Q. You said you could tell that a portion had been spliced?
A. Correct.
Q. Is there any way that within the file you can tell the dates of the — but you didn’t ascertain whether the different segments had different dates?
A. I did — I did see most of the wav files did have a date, but I didn’t particularly see the Windows Media files with a date related to it. That’s one of the things that really got my attention. First of all, we don’t create Windows Media files to begin with so I didn’t really examine them as well as I did the wav files because I’m more particular with the wav files than I am with the Windows Media files.
So as soon as I saw the Windows Media files I knew that something had been you know tampered with more or less.
Q. I see. So the Windows Media file could not have come from the FTR?
A. No, ma’am.
Q. Period?
A. Period.
Respondent also called Brian Butcher, who provided her with the CD of the transcript .he duplicated from the court reporter’s tapes. As Mr. Butcher explained it, the court reporter provided him with two forms of media, an audio cassette tape and digital media. The recordings on the media overlapped each other. Mr. Butcher’s job was to take the two recordings, find the point where they overlapped, and make them into one continuous piece of audio:
A. I made them into one contiguous file that could be played from beginning to end and I would imagine that there was a — at the edit point you probably heard a little Indifference in audio because it was two different microphones that were recording.
Q. So if someone said that that tape had been spliced, would that be accurate?
*663 A. That would be probably accurate, yes.
Mr. Butcher then converted the digital files from their original formats into MP3 format and placed this onto a CD, which he provided to respondent.
Mr. Butcher found the exact same audio at some point toward the end of the first media, and near the beginning of the second media. Therefore, he opined that at least this section had been recorded on the same day. Mr. Butcher was asked on cross-examination whether he added a section of audio during the editing process relating to Judge Keaty’s disclosure, and Mr. Butcher said that he did not splice.in any disclosure, nor was anything missing from the CD “unless there was something missing to begin with before I got it.” Under questioning from the members of the Committee, Mr. Butcher explained that it was his understanding that the digital recorder in the courtroom was not working, so the backup recorder started via audio cassette tape and then was switched to the digital recorder once it began functioning again. What he spliced together were the cassette tape and the digital recording at the point they overlapped. Mr. Butcher emphasized that his splice did not delete any material; it added matter.
Judge Keaty testified that although she had no independent-knowledge of the splicing of the audio tape, she was aware that the tape was spliced when it was copied because she “read it about in some of the papers. And it was spliced — they had to take out — sometimes I’d be having a hearing and another hearing — I’d take out another hearing in between, like in the middle. ... That’s all I know about splicing.”[6] However, on cross-examination, Judge Keaty was presented with the |12minutes front the July 20, 2009 docket, and she admitted that the Hunter case was- the only case on the docket that day.

Hearing Committee Report

After considering the evidence and testimony presented at the hearing, the hearr ing committee made the following factual findings:
The Keaty Matter — With respect to the writ application and other filings, the committee concluded that respondent went too far. Without any factual basis, respondent alleged in the McNabb writ application filed with .this court that the case “highlights the unfavorable consequences of the legal profession — incompetence and/or corruption of its members ...” Respondent also suggested that the “incompetence and/or corruption” is not unique to the McNabb case. At the time the writ application was filed, Judge Keaty was campaigning for a seat on the Third Circuit Court of Appeal. In apparent reference to this fact, the writ application stated, “Although the lower court which affirmed the egregious actions of the trial court is the same court, Judge Keaty is actively campaigning to sit upon, Stan did not presume wrongdoing.” After making this wholly gratuitous comment, respondent then suggested that ope possible reason for the Third Circuit Court of Appeal’s decision, unfavorable to her client was that “[t]he lower court wants to cover up the egregious actions of the trial court so it.cannot be used in the current election.” Respondent not only filed this writ application with this court, but she also e-mailed a copy to her friends and colleagues. Under these circumstances, the committee found that respondent violated Rules 3.1, 3.2, 3.5(d), and 8.2(a) of the Rules of Professional Conduct.
*664 The Weinstein Matter — The committee found.that Ms, Guillory hired respondent to represent her in divorce proceedings while Ms. Guillory and her husband were in an active Chapter 13 bankruptcy proceeding. Respondent |1sadmitted that she failed to obtain proper approval from the bankruptcy court to undertake the representation.
Accordingly, on January 12, 2011, the bankruptcy judge ordered respondent to disgorge the entire fee of $6,839.50 she received from Ms. Guillory within twenty days of the order. When respondent failed to disgorge the fee within the time period ordered, Mr. Weinstein filed a motion for contempt. At the related hearing held on March 16,' 2011, respondent claimed she had not received notice of the written order and had not been furnished with a draft of the order prior to its submission to the bankruptcy judgé, although she was present at the hearing when the judge ordered her to disgorge the fee. The committee found respondent’s testimony to bé credible because the bankruptcy court’s" apparent procedural rules do not require a draft order to be circulated before it is signed by the judge and signed orders are hot served in hard copy but served electronically pursuant to the federal PACER system. Respondent was not a PACER participant. At the hearing, respondent indicated she wanted to appeal the earlier order, but the bankruptcy judge explained that the appeal delays are jurisdictional and, thus, an appeal would be untimely. Considering the circumstances, the judge again ordered disgorgement of "the fee but gave respondent additional time to comply without sanctions.
The committee found respondent’s initial failure to pay the order of disgorgement excusable because of her apparent belief that the order had not yet been signed by the time she received the contempt citation. However, upon learning of the jurisdictional nature of the deadline for appeal, respondent should have obeyed the order immediately. Instead, she refused to return the fee, even after the judge extended the time.
. Despite knowing an appeal would be untimely, respondent continued her efforts to avoid returning the fee. She filed a motion to vacate, which was denied |uby the bankruptcy judge. Then she appealed to the United States District Court, which appeal was dismissed.
After ■ the bankruptcy court-ordered sanctions had increased respondent’s obligation approximately five-fold, Mr. Wein-stein sought to have the bankruptcy court order made executory in the 15th JDC and provoked a judgment debtor examination of respondent. According to the minutes of -this proceeding, respondent failed to fully cooperate in the judgment debtor examination and was ultimately assessed with court costs and ordered to pay attorney’s fees of $500.
In light of these factual findings, the committee determined that respondent’s tdctics in the Weinstein matter crossed the line, causing a delay in Ms. Guillory’s Chapter 13 bankruptcy" estate’s receipt of the funds ordered returned and causing respondent to be assessed with approximately $28,000 in penalties. The committee then determined that respondent violated the Rules of Professional Conduct as alleged in this matter.
In assessing the baseline sanction for respondent’s misconduct, the committee determined that, in the Keaty matter, respondent’s derogatory statements about the judges were false and were made with reckless disregard for the truth. Furthermore, the frivolous allegations of incompetence and/or corruption were prejudicial to the effective administration of justice and were intended to disrupt and delay. *665 In the Weinstein matter, the committee determined that respondent’s failure to timely remit the funds was inexcusable after she learned the appeal deadline had passed, and she delayed the return of the fee by some two years.
The committee further determined that respondent knowingly and intentionally violated duties owed to the legal profession and the legal system. Her conduct caused injury, including unnecessary.waste of judicial and professional | ^resources. After considering the ABA’s Standards for Imposing Lawyer Sanctions, the committee determined that the baseline sanction is suspension.
In aggravation, the committee found a pattern of misconduct and multiple offenses. In mitigation, the committee found the absence of a prior disciplinary record, inexperience in the practice of law (admitted 2004), and .the imposition of other penalties or sanctions.
After also considering this court’s prior jurisprudence addressing' similar misconduct, the committee recommended respondent be suspended from the practice of law for nine months, with six months deferred, followed by a two-year period of supervised probation with the condition that she obtain two additional continuing legal education (CLE) hours in ethics and two additional CLE hours in professionalism.
The public member of the committee dissented and would recommend that respondent be suspended from the practice of law for one year and one day, with no time deferred.
Both respondent and the ODC filed an objection to the hearing committee’s report and recommendation. While the ODC concurred in the committee’s findings of fact and conclusions of law, it objected to the recommended sanction as too lenient. Respondent objected to the committee’s factual findings and recommended sanction, arguing that the charges against her should be dismissed. Respondent also objected to a portion of the cost statement.

Disciplinary Board Recommendation

After review, the disciplinary board determined that the hearing committee’s factual findings are- supported by the record and are not manifestly erroneous. As such, the board' adopted same. The board also determined that the committee | ^correctly applied the Rules of Professional Conduct and adopted the committee’s findings that respondent violated the rules as follows:
Respondent’s unsupported, sweeping, and repeated accusations in the McNabb writ application that the judiciary is incompetent and/or corrupt violated Rules 3.1 and 3.5(d). Respondent also violated Rule 3.5(d), as well as Rule 3.2, by filing numerous, unfounded motions to recuse Judge Keaty and' by filing repeated appeals in Ms. Guillory’s bankruptcy case.- Respondent violated Rules 1.15(d) and 3.4(c) when she failed to timely disgorge the fee as ordered by the bankruptcy judge in Ms. Guillory’s ■ case. Respondent violated Rules 8.2(a) and 8.4(d) by accusing both district and appellate court judges of being incompetent and/or corrupt and suggesting that their decisions were driven by political gain. Additionally, respondent violated Rule 8.4(d) because she caused all parties undue expense and effort in both the family court proceedings and the bankruptcy court proceedings and frustrated the legal system by prolonging the underlying legal matters.
The board then determined that respondent knowingly, if not intentionally, violated duties owed to the legal -profession and the legal system. Her litigation tactics caused significant harm in that her clients’ cases were unduly drawn out, and she wasted judicial, professional, and financial *666 resources. She also harmed the legal profession by filing a writ application with this court suggesting that the judiciary is “incompetent and/or corrupt.” Based on the ABA’s Standards for Imposing Lawyer Sanctions, the board determined that the baseline sanction is suspension. The board adopted the aggravating and mitigating factors found by the committee. Additionally, the board found the aggravating factor of refusal to acknowledge the wrongful nature of the conduct to be present.
After further considering this court’s prior jurisprudence addressing similar misconduct, the board recommended that respondent be suspended from the 117practice of law for one year and one day, with six months deferred, followed by a two-year period of unsupervised probation with the condition that she attend the Louisiana State Bar Association’s Ethics School. Additionally, the board recommended that respondent be assessed with all costs and expenses of these proceedings.
Two board members dissented and would recommend respondent be suspended from the practice of law for one year and one day, with no time deferred.
Both respondent and the ODC filed an objection to the disciplinary board’s recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
DISCUSSION
Bar disciplinary matters fall within the original jurisdiction of this court. La. Const, art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Banks, 09-1212 (La. 10/2/09), 18 So.3d 57. While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee’s factual findings. See In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.
Turning first to the Weinstein matter, the hearing committee made a factual finding that respondent’s tactics were improper and caused a delay in the receipt of funds by Ms. Guillory’s Chapter 13 bankruptcy estate. These factual findings are supported by the record and are not clearly wrong.
118We now address the allegations of misconduct in connection with the Keaty matter. In essence, these allegations arise from language used by respondent in the McNabb writ application, in which she referred to “incompetence and/or corruption” of the members of the legal profession and averred the court of appeal wanted “to cover up the egregious actions of the trial court so it cannot be used in the current election.”
The ODC asserts these statements represent a violation of Rule 8.2(a) of the Rules of Professional Conduct. In contrast, respondent argues that she is not guilty of violating Rule 8.2(a) because her statements were protected speech under the First Amendment and therefore this court cannot sanction her for these statements.
In In re: Simon, 04-2947 (La.6/29/05), 913 So.2d 816, we discussed Rule 8.2(a), stating:
Because this rule proscribes only statements which the lawyer knows to be false or which the lawyer makes with reckless disregard for the truth, it comports -with the First Amendment’s guarantee of free speech. See Garrison v. *667 Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).
In Simon, this court relied on its earlier opinion in Louisiana State Bar Ass’n v. Karst, 428 So.2d 406 (La.1983), which interpreted DR 8-102(B), " the predecessor of Rule 8.2(a). The Karst court adopted an objective standard, rather than a subjective standard, in analyzing whether a statement is knowingly or recklessly false and hence a violation of the rule:
In our opinion, DR 8-102(B) is violated when an attorney intentionally causes accusations to be published' which he knows to be false, or which, with the exercise of ordinary care, he should know to be false. The rationale, for DR 8-102(B) appears in Ethical Consideration 8-6, the pertinent part of which provides:
Adjudicatory officials, not being wholly freed to defend themselves, are entitled to receive the support of the Bar against unjust criticism. While |ina lawyer as a citizen has a right to criticize such officials publicly, he should be certain of the merit of his complaint, use appropriate language, and avoid petty criticisms, for unrestrained and intemperate statements tend to lessen public confidence in our legal system. Criticisms motivated by reasons other than a ■ desire to improve the legal system are not justified.
This provision cléarly illustrates that it is not the genuineness of an attorney’s belief in the truth of his allegations, but the reasonableness of that belief and the good faith of the attorney in asserting it that determines whether or not one has “knowingly” made false accusations against a judge within the meaning of DR 8-102(B). Consequently, where it is shown that an attorney knew, or in good faith should have known, of the falsity of his accusations, that attorney’s unsubstantiated, subjective belief in the truth of those accusations, however genuine, will not excuse his violation of DR 8-102(B). [Emphasis added.]
Courts of other states have reached similar conclusions, and have almost universally disciplined attorneys under an objective reasonableness standard. See In re Cobb, 445 Mass. 452, 838 N.E.2d 1197 (2005) (quoting from In re Terry, 271 Ind. 499, 394 N.E.2d 94 (1979); agreeing with majority view and rejecting New York Times subjective or actual malice test); see also U.S. Dist. Court for Eastern Dist. of Washington v. Sandlin, 12 F.3d 861 (9th Cir.1993) (although language of Rule 8.2(a) is consistent with constitutional limitations placed on defamation actions by New York Times, “because of the interest in protecting the public, the administration of justice, and the profession, a purely subjéc-tive standard is inappropriate”); Florida Bar v. Ray, 797 So.2d 556 (Fla.2001) (purely subjective [New York Times standard is inappropriate in attorney disciplinary' proceedings); In re Graham, 453 N.W.2d 313 (Minn.1990) (“the standard for determining actual malice must be objective when dealing with attorney discipline. We reach this 1 ¡^conclusion because of the interests attorney discipline serves”); Office of Disciplinary Counsel v. Price, 557 Pa. 166, 732 A.2d 599 (1999) (subjective approach unworkable because' lawyer “would always be in the position of defending an allegation, no matter how scurrilous, on the ground that he believéd it to be true”); cf. State ex rel. Oklahoma Bar Ass’n v. Porter, 766 P.2d 958 (Okla.1988) (lawyer who declared that judge “showed all the signs of being a racist” could not be disciplined for engaging in conduct prejudicial to the • administration of-justice or adversely reflected' on fitness to practice; *668 lawyer established objectively reasonable basis for his belief, and record was devoid of attempt to show that his statements were false); Smith v. Pace, 313 S.W.3d 124 (Mo.2010) (holding that before lawyer can be found guilty of criminal contempt for what is written in a pleading, there must be a finding that the lawyer’s statements were made with actual knowledge of their falsity or that the statements were in fact false and were made with reckless disregard of whether they were true or false).
Applying the standards set forth in Simon and Karst, we find respondent’s actions violate Rule 8.2(a). Specifically, we conclude the objective evidence establishes respondent either knew her statements were false or made them with reckless disregard for the truth.
Respondent relies heavily on the purportedly corrupted audio tape from the Hunter hearing as. providing support for her assertions of incompetence and corruption of the legal profession. We acknowledge there is evidence in the record of these disciplinary proceedings indicating that the court reporter’s tapes may have been spliced as a result of a malfunction of the court reporter’s machine. However, we see no evidentiary support for respondent’s implication that Judge Keaty or any person, either through incompetence or corrupt intent, added substantive statements to the official transcript which were not contained in the original hearing. Ordinary experience suggests that equipment can often | ^malfunction without any underlying incompetence or intentional corruption. Thus, in the absence of any objective supporting evidence, respondent acted with a reckless disregard for -the truth when she referred to “incompetence and/or corruption” of the members of the legal profession in pleadings filed in this court.
Even more disturbing is respondent’s statement that the court of appeal “wants to cover up the egregious actions of the trial court so it cannot be used in the current election.” Through the testimony of the judges of the court of appeal panel, the ODC proved this statement was objectively false. Respondent points to no evi-dentiary support whatsoever for her contention that the judges of the court of appeal intentionally altered them judgment to protect Judge Keaty. Regardless of the genuineness of respondent’s belief, the objective facts in the record support the conclusion this statement was made with either knowledge of its falsity or. reckless disregard for the truth.
Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent’s actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass’n v. Reis, 513 So.2d 1173 (La.1987), The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Whittington, 459 So.2d 520 (La.1984).
We find that respondent knowingly and intentionally violated duties owed to the legal profession and the legal system. Her conduct caused injury, including an unnecessary waste of judicial and professional resources. The applicable baseline sanction is suspension. The record supports the aggravating and mitigating factors found by the committee as modified by the board.
122Turning to the issue of an appropriate sanction, we find .guidance from the cases of In re: Simon, 04-2947 (La.6/29/05), 913 *669 So.2d 816, and In re: Octave, 10-1515 (La.10/1/10), 45 So.3d 160. In Simon, an attorney made knowingly false statements concerning the qualifications or integrity of several judges. For this misconduct, we imposed a six-month suspension from the practice of law, with all but thirty days deferred, with the condition that the attorney attend the Louisiana State Bar Association’s Ethics School. In Octave, an attorney failed to comply with several bankruptcy court orders, including failing to pay court-ordered sanctions, failed to maintain a proper client, trust account, and failed to remit funds owed to third-party medical providers. For this misconduct, we suspended the attorney from the practice of law for two years.
Respondent’s misconduct in the Keaty matter is substantially similar to the misconduct in Simon. Respondent’s misconduct in the Weinstein matter is similar to Ms. Octave’s failure to comply with several bankruptcy court orders. However, unlike Ms. Octave, respondent paid all sanctions, and she did not engage in additional misconduct. These facts suggest that a lesser sanction than that imposed in Octave is warranted for respondent’s misconduct in the Weinstein matter.
Considering this case law, we cannot say that the board’s recommended sanction is inappropriate. Accordingly, we will adopt the board’s recommendation and suspend respondent from the practice of law for one year and one day, with six months deferred, followed by a two-year period of unsupervised probation with the condition that she attend Ethics School. We will further impose all costs of these proceedings against respondent. ■
DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is [^ordered that Christine M‘. Mire, Louisiana Bar Roll number 29352, be and she hereby is suspended from the practice of law for one year and one day. It is further ordered that all but six months of the suspension shall be deferred. Following the active portion of the suspension, respondent shall be placed on unsupervised probation for two years. As a condition of probation, respondent is ordered to attend and successfully complete the Louisiana State Bar Association’s Ethics School. The probationary period shall commence from the date respondent and the ODC execute a formal probation plan.' Any failure of respondent to comply with the conditions of probation, or any misconduct during the probationary period, may be grounds for making the deferred portion of the suspension executory, or imposing additional discipline, as appropriate. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rulé XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.

. Judge Keaty has since béen elected to the Court of Appeal, Third Circuit.

. The formal charges involve events that occurred in 2009, Respondent was admitted to the practice of law in Louisiana in 2004.

. In this additional language, Judge Keaty purportedly explained that her son employed Ms. Coussan’s sister.

. Prior to producing the tapes, the court reporter, through counsel, filed a lawsuit, captioned "Motion for Protective Order, Restriction of Scope of Discovery, In Camera Inspection, and for Postponement of Discovery Date,” against Mr. Hunter. Subsequently, the court reporter and respondent had reached a stipulation that a duplicate copy would be made of the audio tape from the court reporting equipment. The ultimate disposition of the court reporter's lawsuit is unclear. However, the record indicates that in January 2010, Judge Herman Clause consolidated the court reporter’s suit with the Hunter domestic proceeding and ordered that Judge Keaty be recused in Hunter "due to community interest.”

. The ODC made additional allegations of misconduct and rule violations in the Keaty matter in reference to another case handled by respondent, Hindelang v. Hindelang. Concerning Hindelang, the ODC alleged that respondent failed to advise her client of settlement offers, made false allegations that the opposing counsel altered documents, and misrepresented to the judge that she had not tiled for a' continuance. However, after considering the testimony, and evidence presented at the formal hearing, the hearing committee found that the ODC failed to prove these allegations and rule violations by clear and convincing evidence. The ODC did not object to the committee's findings of fact or conclusions of law; thus, this opinion does not address these additional allegations.

. In her lawsuit, the court reporter represent- , ed that the audio tape respondent sought contained a multitude of closed family court hearings.